## No. 9923.

JOHN I. ADAMS & CO. VS. BOARD OF LIQUIDATION OF THE STATE OF LOUISIANA.

It is the obvious purpose of the State funding law No. 11 of 1875 that the *status* of each issue of ·State bonds or warrants, the legality of which is questioned, should be settled in a single suit by any holder of such securities ; and, for this purpose, the law authorizes all other holders of like bonds or warrants to intervene in such suit and assert their rights.

Whatever relaxation might be made in favor of a bondholder who had been ignorant of the pendency of such a suit, it would be inequitable to permit one affected with full knowledge thereof to take the chances of a favorable judgment which would settle his rights, and then, after an adverse decision, raise, in a new suit, issues contradictory of those presented in the first. In any event, even if not estopped by *res judicata,* the plaintiff, in such new suit, would certainly be compelled to overthrow, by conclusive proof, the case which had been made in the former one and on which the decision as to

the *status* of the bonds rested; and the defendant was authorized to offer and have received the whole record of such former case, including the evidence.

Weighing the whole evidence as thus made up, the facts on which the former decision was based are not disproved, and plaintiff's bonds must be denied the privilege of being funded for the same reasons for which like bonds were rejected in the case of Sage vs. Board of Liquidation, 37 Ann. 412.

Moreover, these bonds were not included in the Auditor's Report of 1874, which this Court held in the Pacific R. R. case, 30 Ann. 980, was the basis of the funding scheme, within which, consequently, they were not embraced.

The case is not affected by any equities which plaintiffs, as transferees before maturity, may have under the law of negotiable instruments. The Court determines, not all their legal rights, but only their right to *fund*, which right must submit to the conditions imposed by the funding law, applicable to all obligations of whatever nature and by whomsoever held.

APPEAL from the Seventeenth District Court, Parish of East Baton Rouge. *Burgess*, J.

*B. J. Sage* and *E. W. Robertson* for Plaintiffs and Appellants.

*M. J. Cunningham*, Attorney General, for Defendant and Appellee.

The opinion of the Court was delivered by

FENNER, J. Plaintiffs are holders of four bonds, for $1000 each, of the same series and character in every respect as the bonds which were involved in the case of B. J. Sage vs. The Board of Liquidation, decided by this Court, and reported in 37 Annual 412. Although we held in that case that the bonds therein involved were not fundable, plaintiffs, represented by B. J. Sage as attorney, claim, in this proceeding, that their bonds, though standing precisely *in consimili casu*, are fundable, and demand judgment to that effect.

The bonds in both cases belong to a series of one hundred and eighty-four thousand dollars, issued at one time to the same person, Montfort Wells, in the same manner and for the same consideration, under Act No. 16 of 1864, passed by the Legislature of the State, which professed allegiance to the government of the Confederate States.

We find in the record the following admission: "The four bonds sued on in this case and the five bonds sued on in the Sage case were all part of the 184 bonds acquired by Wells from the State at the same time and in the same transaction."

Mr. Sage, as a witness in this case, testifies as follows: "I think I know where the bonds that were issued to Wells are. I have been connected with and interested in these bonds for twelve or fifteen years. Have been the attorney and professional adviser of the

original holders of these bonds for fifteen or twenty years. These bonds are placed where they are now by me, either as owner or agent of the owners, with the understanding and reservation that I am to act as agent of the present owners in any settlement with the State that may be made. When the State sees proper to settle the matter I am fully authorized to represent the owners. I have made considerable efforts to settle or collect these bonds with the Legislature and public officials. In these efforts I represented the whole of these bonds, except a few which have been lost.

"In my own right I own, I think, about one-third of these bonds, with the obligation to attend to the settlement and litigation attending them, except those that have been transferred, and as a part of the consideration referred to is a long list of arduous services for many years as attorney and agent, and whatever I do for any of these parties is to be justly compensated. The efforts I have made in these respective suits have been confined to them, and any advantage to other interests would be incidental, though I have wished to promote the interest of all by any success I might attain. I am now attorney or agent for six or seven different holders of these bonds under the reservation above mentioned, and only to that extent, with the control to settle with the State, if the State will make proper terms."

The bonds in this case were transferred to plaintiffs, *during the pendency of the Sage suit*, with the endorsement, " M. Wells, per pro B. J. Sage," said M. Wells being the registered owner, as appears from the Auditor's certificate of registry on the back of the bonds.

The following is the power of attorney under which this transfer was made :

" MR. B. J. SAGE, New Orleans :

"*Dear Sir*—You are hereby authorized to endorse or transfer any of the bonds issued by Henry W. Allen, late Governor of Louisiana, belonging to my wife, but issued in my name to my order, for any purpose you may deem proper. He can sign my wife's name, also, when it is required in the management of said bonds.

" [Signed]                      " MONTFORT WELLS,
                                " JEANNETE WELLS.
"*Authorized by her said husband,*
                                " MONTFORT WELLS."

Plaintiffs themselves testify that, after the transfer, " the bonds were left in Sage's hands to be collected by him as our attorney and agent."

In the petition in the first suit Mr. Sage alleged " that he holds as

the assignee and agent of Mrs. J. D. Wells and other parties five certain bonds of one thousand dollars each," etc.

The foregoing statements, grouped together, plainly and conclusively indicate that, at the time when he instituted the first suit, Mr. Sage held the bonds now presented by plaintiffs, by the same right and in the same capacity in which he held the bonds then sued upon, i. e., "as the agent and assignee of Mrs. J. D. Wells and other parties," and that when *pendente lite,* he transferred these bonds to John I. Adams & Co., he still retained possession of them and continued to represent the latter as he had the former owners.

Mr. Sage, thus representing the whole of these bonds and being the common agent of all the owners thereof for the express purpose of prosecuting their claims against the State, brought his first suit upon five of these bonds in the declared capacity of "assignee and agent of Mrs. J. D. Wells and other parties." In that petition, verified by his unqualified oath, Mr. Sage alleged that the bonds were issued and delivered in exchange for certain property delivered to the State government.

On the trial the testimony of Montfort Wells, the person to whom the bonds were issued, was taken, and he positively swore that the whole of these bonds were issued to him in exchange for sugar which had been raised upon a plantation belonging to his wife, Mrs. J. D. Wells. His statement was supported by the testimony of E. W. Halsey and of James C. Wise, officers then connected with the State government.

Upon these pleadings and this evidence, we held that the bonds were not "issued in strict conformity to law," as required by the express terms of the supplemental funding Act No. 11 of 1875, and, therefore, that they were not fundable. See Sage vs. Board, 37 Ann. 412.

In the present suit the plaintiffs omit the allegations which had been made in the Sage case with reference to the exchange, and content themselves with the general allegation on that point that the bonds were "sold to Mrs. J. D. Wells," and were issued "in strict conformity to law."

The plea of *res adjudicata* was interposed by the State, based on the record and judgment in the Sage case.

We think it would undoubtedly be good against Mrs. J. D. Wells and B. J. Sage, from whom Adams & Co. acquired the bonds now sued on. The case would be assimilated to that where the holder of two promissory notes given in the same transaction had brought suit on

one of them which had been defended on the ground of fraud or other vice in the transaction on which both notes were based, and it is held that a judgment on that issue would be conclusive in a subsequent action on the other note. Mr. Bigelow lays down the general rule: "A point once adjudicated by a court of competent jurisdiction may be relied on as an estoppel in any subsequent collateral suit in the same or any other court, when either party, or the privies of either party, allege anything inconsistent with it, and this, too, whether the subsequent suit be upon the same or a different cause of action." Bigelow on Estoppel, p. 45 ; Johnson vs. Weld, 8 Ann. 126 ; Gardner vs. Buckbee, 1st Cowen 120 ; Edgell vs. Sigerson, 26 Mo. 583; Hanley vs. Foley, 18 B. Monroe 519.

And it has been pointedly affirmed by the Supreme Court of the United States, in a very analagous case, where it was held that judgment in a suit upon certain municipal bonds, part of a larger issue, is conclusive on the question of validity of the issue, in a suit between the same parties on other bonds of the same issue. Beloit vs. Morgan, 7 Wall 619.

It is a grave and doubtful question whether Adams & Co., acquiring these bonds from the parties to that suit *pendente lite,* and leaving them in the hands of the principal party thereto, as their agent and attorney, thus affecting them with his full knowledge of the pendency of the suit, have not thereby become privies and subject to the same estoppels which operate against their authors. It is not necessary, however, that we should decide this point on general principles, and we do not do so.

It is sufficient to consider it in reference to the peculiar action here involved, which is brought under the special provisions of the Funding Act No. 11 of 1875. That act regulates the duties of the Board of Liquidation touching the funding of bonds or warrants of the State, the legality or validity of which has been, or may be, questioned, and, in such case, it prohibits the funding "until the legality and validity of each and every *issue* of bonds and warrants, as aforesaid, shall have been finally passed upon and determined by the Supreme Court of the State." It evidently contemplates that the question, as to *each issue,* shall be determined in a single suit, and provides that "all costs incurred in any suits under this act, to the extent of *one suit* carried to a final issue, as to each separate *issue* of bonds or warrants *   * shall be borne by the State," etc. In order to protect all rights which may be involved in such suit, it expressly provides that all parties concerned, every tax-payer, and any holder or holders of bonds or

warrants, whose legality, etc., is questioned in any suit or suits brought under the provisions of this act may intervene in said suit or suits, and that the cost of such intervention shall abide the result of the suits."

We have held that, inasmuch as a "final decree" of this Court is an essential prerequisite to the funding, the warrant or bondholder may appeal to this Court even when the judgment below has been *in his favor.* State *ex rel.* Meyers vs. Board, 33 Ann. 126; Charles vs. Board, 37 Ann. 177.

It is clearly the equitable purpose of the law that the rights of all holders of bonds and warrants of the same issue shall be settled by one decision made in a case involving any of such bonds or warrants, and that all parties concerned should appear and vindicate their rights in such suit. Whatever relaxation might be made in favor of a bondholder, who had failed to take cognizance of such a suit through ignorance of its pendency, it would certainly be most inequitable to permit parties situated like the present plaintiffs, who were represented as to the bonds held by them by the very plaintiff in that suit, to lie quietly by and take the chances of the decision, which, if favorable, would have conclusively settled the status of their bonds, and then, after an adverse decision, to come in and raise issues absolutely contradictory of those then presented. Their silence and failure to intervene, under the express authority to that effect, granted by the law, may well be construed as an acquiescence in the issues as made in the suit, and a submission to the judgment rendered thereon.

But the plaintiffs here go much further than this. Not only do they claim exemption from any prejudice, by reason of said judgment, but they seek to exclude from our view the case which was therein made and the evidence on which our decision rested. The State offered the entire record in the Sage case, including the evidence offered therein, to which plaintiffs objected on the ground that it was *res inter alios acta,* and they excepted to the ruling of the judge admitting it. We think the ruling was manifestly correct. No one can read the funding act of 1875 without discovering its clear intention to make the decision of a single suit as to each issue of bonds, at least *prima facie* conclusive as to the fundability *vel non* of all the bonds of that series. We go to the verge of indulgence to holders of bonds not parties to such a suit, if we allow them the privilege of rebutting such presumption by producing new evidence which, if it had been presented in the former suit, would have led to a different conclusion; but, in so doing, the new evidence must be taken in connection with the former, and the whole must be

weighed together, and we must then determine whether, on such consideration, we should reach a different conclusion.

Thus, in the Sage case, upon the evidence then introduced, we held that the issue of bonds, to which those of plaintiffs belonged, was made as an exchange for sugar, and, therefore, not "in strict conformity to law." Now plaintiffs come and ask us to decide the contrary, and to hold that those bonds were not exchanged, but were sold for money as directed by the law. The least that can be required of them is surely that they should make a stronger case in favor of their position than was made in support of the former; and, in order to do so, they must present the whole together; for, while they represent but four bonds, we are called on to render a decision binding on the State as regards 184 bonds, and overthrowing a former decision on the same question.

Under this view, receiving and considering the testimony presented in the Sage case, we are left without a shadow of doubt that the allegations then made were true, that the bonds were unquestionably exchanged for sugar, and were not sold, as directed in the act under which they were issued. Who should have known the fact so well as Montfort Wells, who conducted the transaction, and who most circumstantially testifies that he refused to sell the sugar for the money then current, and would accept no settlement except in bonds? His testimony is supported by that of the other witnesses, and is contradicted by nothing except entries in the Auditor's books of the same character, though a little more extensive, as those which were presented and discussed by us in the Sage case. We are satisfied that these entries are merely formal, made to satisfy the requirements of the State's method of book-keeping. Nothing could be more improbable than the theory that the Governor had paid to Wells $184,000 in currency for this sugar, with which Wells had bought the bonds. Nor is any showing made that the Governor had such funds of the State in his possession, or any authority of law to so dispose of them.

In addition to the foregoing, we may say that the decision of this Court, in the Pacific Railroad case, 30 Ann. 980, substantially holds that only the issues of bonds and warrants enumerated in the Auditor's report of 1874, were embraced in the funding scheme; and the evidence here shows that these bonds were not included therein. We doubt if they have ever been included, as debts of the State, in any Auditor's report since the reconstruction Constitution of 1868. It would require great hardihood for anyone to say that it was the intention of the Legislatures, which framed these funding laws, to em-

brace these bonds or to authorize their funding. We are satisfied there was no such intention. Nor is this case, in the slightest degree, affected by any equities which plaintiff might claim under the law governing negotiable instruments. That question was fully settled in Lord Cecil's case, 30 Ann. 34, where, with obvious correctness, it was held that in proceedings to fund under these laws, the Court was not called upon to determine all the legal rights which transferrees of negotiable bonds before maturity might have against the State, but simply their right to fund, under these special laws, which right could only be asserted on strict compliance with the conditions imposed by the laws, which conditions apply equally to all obligations by whomsoever and under whatsoever title they may be held.

Judgment affirmed.